# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| AMBER PARKER et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Cause No. 1:09-cv-885-WTL-WGH |
| | ) |
| INDIANA HIGH SCHOOL ATHLETIC | ) |
| ASSOCIATION et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

Presently before the Court are three motions for summary judgment – one filed by the School Defendants[1] (Docket No. 82), one filed by the Plaintiffs (Docket No. 92), and one filed by the Indiana High School Athletic Association (Docket No. 108). All of these motions are fully briefed, and the Court being duly advised, now **GRANTS** the School Defendants' motion, **DENIES** the Plaintiffs' motion, and **GRANTS** the Indiana High School Athletic Association's motion.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with

---

[1] The Plaintiffs sued fourteen Indiana school corporations: Franklin County Community School Corporation, South Dearborn Community School Corporation, Decatur County Community Schools, Switzerland County School Corporation, Fayette County School Corporation, Lawrenceburg Community School Corporation, Richmond Community Schools, Batesville Community School Corporation, Jennings County Schools, Rush County Schools, Union County/College Corner Joint School District, and Muncie Community Schools. For simplicity's sake the Court will refer to these Defendants as the "School Defendants" throughout this Entry.

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II.  BACKGROUND

The Indiana High School Athletic Association ("IHSAA") is an Indiana not-for-profit corporation that administers interscholastic athletic competitions among its member schools. To this end, the IHSAA promulgates rules and regulations for its members and their students. The IHSAA also sponsors season-ending tournaments, which it terms "Tournament Series Contests," for the twenty sports that it recognizes. Although the IHSAA schedules Tournament Series Contests, the scheduling of all other games, which are known as "Season Contests," is left to member schools. The IHSAA does not permit its members to schedule Season Contests on Sundays. It also, with some limited exceptions not relevant here, does not allow its members to

schedule either girls' or boys' basketball teams to play more than two weeknight[2] Season Contests per week. Finally, the IHSAA dictates when, and for how long, athletic seasons run. For example, the IHSAA allows its members to schedule boys' basketball Season Contests "beginning on Monday, week 21 of the IHSAA calendar, until the starting date of the basketball sectional of the Boys' Basketball Tournament Series." Docket No. 109 at 6. Similarly, "[m]ember schools may schedule girls' basketball Season Contests beginning on Monday, week 19 of the IHSAA calendar, until the starting date of the basketball sectional in the Girls' Basketball Tournament Series." *Id*. at 7.

Amber Parker is the mother of J.L.P., who previously played basketball for the Franklin County High School ("FCHS") girls' basketball team.[3] From 2007 to 2009, Parker also served as the head coach of the FCHS girls' basketball team. Tammy Hurley is the mother of C.H., who currently plays for the FCHS girls' basketball team.[4]

Parker and Hurley brought this suit on behalf of their daughters, alleging that the School Defendants and the IHSAA violated Title IX of the Education Amendments of 1972 and the Fourteenth Amendment of the United States Constitution[5] by scheduling girls' basketball games on non-preferred dates and times. The gist of the Plaintiffs' claim is that the Defendants

---

[2] The IHSAA defines a weekday as "a night game when school is scheduled the next day." Docket No. 109 at 6-7.

[3] In July 2010, the Parker family relocated to Massachusetts. Accordingly, J.L.P. withdrew from FCHS and no longer plays basketball for the school.

[4] After the Parkers decided to move out of state, the Plaintiffs filed an unopposed motion to add Hurley and C.H as plaintiffs. Docket No. 116. The Court granted the Plaintiffs' motion on July 27, 2010. Docket No. 117.

[5] The Plaintiffs' Fourteenth Amendment claim is brought pursuant to 42 U.S.C. § 1983.

assigned boys' basketball teams to play on preferred dates and times, typically Friday and Saturday evenings, more frequently than the Defendants assigned girls' basketball teams to play at these preferred times.

### III.  DISCUSSION

The Court previously dismissed the Title IX claim against the IHSAA, *see* Docket No. 77, and on September 27, 2010, the Court granted the School Defendants' partial motion for summary judgment on the Plaintiffs' § 1983 claim.  *See* Docket No. 126.  Thus, what remains to be resolved is the Plaintiffs' Title IX claim against the School Defendants and the Plaintiffs' § 1983 claim against the IHSAA.

**A.     Title IX claim against the School Defendants.**

Title IX provides, with some exceptions not relevant here, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  The Department of Education's athletic regulations interpret Title IX and set forth the standards for assessing whether an institution's athletic programs are in compliance with Title IX.  The parties and the Court agree that under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the Department of Education's regulations are entitled to deference.  "'The degree of deference is particularly high in Title IX cases because Congress explicitly delegated to the agency the task of prescribing standards for athletic programs under Title IX.'"  *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 288 (2d Cir. 2004) (quoting *Cohen v. Brown Univ.*, 991 F.3d 888, 895 (1st Cir. 1993)).

The relevant regulation states:

> A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:
> (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
> (2) The provision of equipment and supplies;
> (3) Scheduling of games and practice time;
> (4) Travel and per diem allowance;
> (5) Opportunity to receive coaching and academic tutoring;
> (6) Assignment and compensation of coaches and tutors;
> (7) Provision of locker rooms, practice and competitive facilities;
> (8) Provision of medical and training facilities and services;
> (9) Provision of housing and dining facilities and services;
> (10) Publicity.

34 C.F.R. § 106.41(c) (2000). The first factor, "[w]hether the selection of sports and levels of competition effectively accommodates the interests and abilities of members of both sexes," *id.* § 106.41(c)(1), is associated with so-called effective accommodation claims. *See Pederson v. Louisiana State Univ.*, 213 F.3d 858, 865 n.4 (5th Cir. 2000); *Boucher v. Syracuse Univ.*, 164 F.3d 113, 115 (2d Cir. 1999). Effective accommodation claims allege that the selection of sports or the number of opportunities for participation by female athletes are unequal. *See Boucher*, 164 F.3d at 115. Factors two through ten are geared toward another issue – equal treatment. An example of an equal (or unequal) treatment claim is an allegation that a school provides "unequal scholarship funding to varsity female athletes as compared to varsity male athletes." *Id*. The Plaintiffs in this case assert an equal treatment claim against the School Defendants based on the School Defendants' scheduling of girls' and boys' basketball games.

A Policy Interpretation issued in 1979 by the Department of Health, Education, and

5

Welfare's Office for Civil Rights[6] and used by the Department of Education's Office for Civil Rights explains how the Department of Education interprets the Title IX regulations. This document, entitled Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71,413 (Dec. 11, 1979) (hereinafter "1979 Policy Interpretation"), is given substantial deference by the courts. *See Cohen*, 991 F.2d at 896-97. Although the 1979 Policy Interpretation "is designed specifically for intercollegiate athletics . . . its general principles will often apply to club, intramural, and interscholastic athletic programs, which are also covered by the regulation." 44 Fed. Reg. at 71,413. The 1979 Policy Interpretation is divided into three sections, which address: (1) compliance in financial assistance (scholarships) based on athletic ability; (2) compliance in other program areas; and (3) compliance in meeting the interests and abilities of male and female students. *Id*. at 71,414. Part two, compliance in other program areas, corresponds to 34 C.F.R. § 106.41(c)(2)-(10), and is relevant to the instant case.

The 1979 Policy Interpretation explains:

> The Department will assess compliance with . . . the general athletic program requirements of the regulation by comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes. Institutions will be in compliance if the compared program components are equivalent, that is, equal or equal in effect. Under this standard, identical benefits, opportunities, or treatment are not required, provided the overall effect of any differences is negligible.

---

[6] The Department of Health, Education, and Welfare ("HEW") was the predecessor to the modern Department of Education. In 1979, Congress split HEW into the Department of Health and Human Services and the Department of Education. *See* Department of Education Organization Act, Public Law Number 96-88, 93 Stat. 669 (1979) (codified at 20 U.S.C. §§ 3401-3510). All educational functions were transferred to the Department of Education, *see* 20 U.S.C. § 3441(a)(1), and all HEW regulations in effect when the split occurred were duplicated by the Department of Education. *See* 34 C.F.R. pt. 106.

44 Fed. Reg. at 71,415.  For each program component (e.g., equipment and supplies, scheduling of games and practice time, or travel and per diem allowance) the 1979 Policy Interpretation lists the factors that should be examined to determine compliance.  With respect to the scheduling of games and practice times the interpretation states:

> Compliance will be assessed by examining, among other factors, the equivalence for men and women of:
> (1) The number of competitive events per sport;
> (2) The number and length of practice opportunities;
> (3) The time of day competitive events are scheduled;
> (4) The time of day practice opportunities are scheduled; and
> (5) The opportunities to engage in available pre-season and post-season competition.

44 Fed. Reg. at 71,416.  The 1979 Policy Interpretation also states that the Department of Education's determination of compliance is based on:

> a.  Whether the policies of an institution are discriminatory in language or effect; or
> b. Whether disparities of a substantial and unjustified nature exist in the benefits, treatment, services, or opportunities afforded male and female athletes in the institution's program as a whole; or
> c.  Whether disparities in benefits, treatment, services, or opportunities in individual segments of the program are substantial enough in and of themselves to deny equality of athletic opportunity.

*Id*. at 71,417.  What this means is that a disparity in a single program component, such as scheduling, *can* constitute a violation of Title IX if the disparity is "substantial enough . . . to deny equality of athletic opportunity." *Id*.  However, the 1979 Policy Interpretation does not require identical scheduling for boys' and girls' sports.  Moreover, a disparity that disadvantages one sex in one area can be offset by a benefit to that sex in another area.  In the instant case the School Defendants have not provided the Court with any evidence that their female athletes receive better treatment than their male counterparts so as to offset any disadvantage resulting

7

from the School Defendants' basketball scheduling practices. Accordingly, the Court must determine whether the disparity in the scheduling of girls' basketball games is substantial enough by itself to deny the Plaintiffs equality of athletic opportunity.

The Plaintiffs cite *McCormick*, 370 F.3d at 275, and *Communities for Equity v. Michigan High School Athletic Ass'n*, 178 F.Supp 2d. 805 (W.D. Mich. 2001), *aff'd*, 459 F.3d 676 (6th Cir. 2006), in support of their argument that the School Defendants' disparate scheduling of girls' and boys' basketball games is significant enough to constitute a stand alone violation of Title IX. However, the Court does not believe that either of these cases is analogous to the instant situation.

*McCormick* arose out of the scheduling of girls' high school soccer in New York. The majority of school districts scheduled girls' soccer in the fall and the state championship was held in the fall. Nonetheless, the defendant school districts – Pelham and Mamaroneck – scheduled their girls' soccer seasons in the spring. As a result, girls who played soccer for Pelham or Mamaroneck could not compete in the state championship. *McCormick*, 370 F.3d at 280. Members of the Pelham and Mamaroneck girls' soccer teams filed suit alleging that the schools' scheduling practices violated Title IX. *Id*. Following a trial, the district court entered judgment for the schools and the plaintiffs appealed. The Second Circuit concluded that the scheduling disparity was significant enough to violate Title IX and accordingly reversed the lower court. The appellate court was swayed by the fact that "[t]he scheduling of soccer in the spring . . . places a ceiling on the possible achievement of the female soccer players that they cannot break through no matter how hard they strive. The boys are subject to no such ceiling." *Id*. at 295.

8

Similarly, in *Communities for Equity*, the Michigan High School Athletic Association ("MHSAA") scheduled "athletic seasons and tournaments for six girls' sports during less advantageous times of the academic year than boys' athletic seasons and tournaments." 178 F.Supp. 2d at 807. By "less advantageous" the plaintiffs meant that the girls' sports were "played in a non-traditional season, i.e., a season of the year different from when the sport is typically played." *Id*. The plaintiffs alleged that "the non-traditional season [was] a disadvantageous time of the year to play the sport." *Id*. The district court concluded that the MHSAA's scheduling practices imposed a number of specific disadvantages to the girls' sports teams scheduled during non-traditional seasons. These disadvantages were countered by very few potential advantages to the girls' teams. The court explained that the scheduling practice deprived girls of "contemporaneous role models, skills development, and team-building opportunities." *Id*. Based on these disadvantages, the district court concluded that the MHSAA "violated and continues to violate Title IX by scheduling seasons of the sports at issue in the manner which it has." *Id*. at 857.

Despite the Plaintiffs' arguments to the contrary the instant case is not similar to either *McCormick* or *Communities for Equity*. In *McCormick*, the schools' scheduling of girls' soccer deprived girls of an opportunity to compete for a state championship. Boys were not denied such an opportunity. In *Communities for Equity*, the MHSAA scheduled only girls' sports out-of-season. In the instant case the Plaintiffs play basketball during the "appropriate" season and they are able to compete for the state championship. The Plaintiffs' complaint is that they are scheduled to play on non-preferred dates more frequently than the boys' team. This does not deprive the Plaintiffs of role models, inhibit their skills development, or prevents team-building.

9

Unlike *Communities for Equity* and *McCormick*, where the defendants' conduct affected the plaintiffs' athletic development and capped their ability for athletic achievement, in the instant case the School Defendants' conduct does not hinder the Plaintiffs' development of basketball skills. In short, the disparity in treatment in this case simply does not rise to the level seen in either *Communities for Equity* or *McCormick*. The School Defendants' treatment of the Plaintiffs does not result in a disparity that is so substantial that it denies the Plaintiffs equality of athletic opportunity. Accordingly, there is no violation of Title IX and the School Defendants' motion for summary judgment is **GRANTED**.

B.      **Equal protection claim against the IHSAA.**

The Plaintiffs' Fourteenth Amendment Equal Protection claim against the IHSAA is brought pursuant to 42 U.S.C. § 1983. "To be liable under 42 U.S.C. § 1983 for violating the Fourteenth Amendment, an entity . . . must be considered a 'state actor.'" *Communities for Equity*, 178 F. Supp. 2d at 846. In addition, "[t]o state a Fourteenth Amendment claim, Plaintiffs must also allege that Defendant treats high school boys differently from girls." *Id*. at 848. "Once Plaintiffs have established a gender classification, the burden of justifying the classification shifts to Defendant, and the justification must be 'exceedingly persuasive.'" *Id.* In other words, in order to succeed, the Plaintiffs in the instant case must establish that they suffered deprivation of a federally-recognized right (the Fourteenth Amendment) perpetrated by a state actor (the IHSAA).

The IHSAA does not challenge the Plaintiffs' assertion that it is a state actor. And, based on the Indiana Supreme Court's decision in *IHSAA v. Carlberg*, 694 N.E.2d 222, 229 (Ind. 1997), it appears that the IHSAA is a state actor. Accordingly, the Court turns to the second

prong of the § 1983 analysis and considers whether the IHSAA has violated the Plaintiffs' Fourteenth Amendment Equal Protection rights.

The Plaintiffs concede that the IHSAA has not taken any direct action against them. It is undisputed that the Plaintiffs' § 1983 claim stems from the scheduling of Season Contests. It is also undisputed that the IHSAA does not schedule either boys' or girls' basketball Season Contests. Although the IHSAA regulates how many weeknight games can be played each week and the IHSAA ultimately controls the length of the basketball season, these responsibilities are managed in an undisputedly even-handed and non-discriminatory manner by the IHSAA.

Apparently in recognition of the fact that the IHSAA has not taken any discriminatory action against them, the Plaintiffs propose a novel theory that purports to hold the IHSAA liable for its "deliberate indifference to gender-based discrimination." Docket No. 94 at 27. According to the Plaintiffs, despite the fact that the IHSAA was "warned in 1997 by [the Office of Civil Rights] that some of its member schools may be engaged in discriminatory scheduling practices, IHSAA decided to look the other way." *Id*. at 28. And, in spite of a "January 24, 2009 article in the *Indianapolis Star* . . . showing that these inequalities persisted, and despite the fact that it regulates most other aspects of the scheduling of high school basketball competitions[,] [t]he IHSAA made a conscious choice to remain on the sidelines." *Id*. Thus, the Plaintiffs argue that "by failing to mandate gender equality in the scheduling of basketball games during prime times through its otherwise expansive regulatory powers in accordance with its policy of deliberate indifference, IHSAA is actually facilitating discriminatory gender-based scheduling by its member schools." *Id*.

The problem with the Plaintiffs' argument is that despite their rhetoric, they have not

11

cited a single federal case that supports using a deliberate indifference theory to hold the IHSAA liable in this situation. The cases that the Plaintiffs cite deal with pretrial detainees, false arrests, and students subjected to sexual harassment or bullying. None of these cases are analogous to the present situation. Just because the Plaintiffs have allegedly suffered an injury does not mean that they can hold the IHSAA liable. Before a state actor's failure to act can give rise to legal liability, there must be a constitutionally recognized duty on the defendant to act. *See Jackson v. Byrne*, 738 F.2d 1443, 1446 (7th Cir. 1984). Here, the Plaintiffs point to no such duty on behalf of the IHSAA. Accordingly, the IHSAA's motion for summary judgment is **GRANTED**.

## CONCLUSION

For the foregoing reasons, the School Defendants' Motion for Summary Judgment (Docket No. 82) is **GRANTED**. The Plaintiffs' Motion for Summary Judgment (Docket No. 92) is **DENIED**. The Indiana High School Athletic Association's Motion for Summary Judgment (Docket No. 108) is **GRANTED**.

SO ORDERED: 10/06/2010

_____
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to:

Robert M. Baker III
rbaker@rbakerlaw.net

William R. Groth
Fillenwarth Dennerline Groth & Towe LLP
wgroth@fdgtlaborlaw.com

Mark W. Sniderman
Caplin Sniderman P.C.
mark@caplinlaw.com

Thomas E. Wheeler II
Frost Brown Todd LLC
twheeler@fbtlaw.com